# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **PEGGY WISLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-04-S-0071-NE** |
| | ) | |
| **WAL-MART STORES INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff, Peggy Wisler, asserts claims against Wal-Mart Stores, Inc. ("Wal-Mart"), her former employer, for unlawful sexual harassment, exposure to a hostile work environment, and retaliation — all pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq* [1] — and supplemental state law claims for negligent and/or malicious retention, supervision, and training.[2]  The case presently is before the court on defendant's motion for summary judgment,[3] and defendant's motion to strike plaintiff's deposition errata sheet.[4]  For the reasons set

---

[1] *See* doc. no. 1 (Original Complaint), and doc. no. 19 (Amended Complaint), at Counts One, Two, and Four.  Plaintiff filed her amended complaint, upon the direction of the court, on August 10, 2004.  The court allowed the amended complaint in order to correct some deficiencies alleged by defendant with regard to plaintiff's original complaint.

[2] *Id.* at Count Three.

[3] Doc. no. 39.

[4] Doc. no. 55.

forth herein, the court concludes the motion for summary judgment is due to be granted.  The motion to strike will be denied as moot.

PART ONE

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides, in the part pertinent here, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks

and citations omitted).

## PART TWO

### *Summary of Facts*

Plaintiff, Peggy Wisler, is an optician with a license from the American Board

of Opticianry.[5]  From 1985 until her employment by Wal-Mart Stores, Inc. ("Wal-

Mart") in July of 1999, plaintiff had worked in a management capacity in various eye-

care centers.[6]  She commenced her employment with Wal-Mart as an optician at the

Vision Center in Wal-Mart Store #434 in Huntsville, Alabama.[7]  She was promoted

to Manager of that Vision Center in August of 1999.[8]  Plaintiff's personnel file

reflects one performance review from the time period during which she worked as

Vision Center Manager.   On this appraisal, plaintiff's performance was rated

"Exceeds Expectations," the highest possible rating.[9]  Colleen Epperson, who was a

Regional Manager, and who eventually became plaintiff's direct supervisor, testified

---

[5]Doc. no. 41 (defendant's evidentiary submission), Tab A (deposition of Peggy Wisler), at 9.

[6]*Id.* at 31-34.

[7]*Id.* at 38.

[8]*Id.* at 41.

[9]Doc. no. 45 (plaintiff's evidentiary submission), Tab L, at documents bearing Bates Stamp Nos. 00026 and 00027.

that plaintiff was a "good store manager"; her numbers, sales, and profitability all were good.[10]

Plaintiff was promoted to the position of Optical District Manager over District #280, which covers the Atlanta, Georgia area, on April 20, 2002.[11]  She interviewed for this position with Regional Managers Colleen Epperson, Robert Young, Mike Cantrell, and one other manager whose name plaintiff cannot recall.  She also interviewed with Divisional Manager Lance De La Rosa and Regional Personnel Manager Tim Clark.[12]  Tim Clark informed plaintiff that she had been chosen for the position, and that she would be directly supervised by Colleen Epperson.  Plaintiff does not know who made the decision to promote her,[13] but Wal-Mart claims that it was Epperson, and that Lance De La Rosa approved her decision.[14]  However, the decision to promote plaintiff was made only after Epperson had attempted to transfer a male district manager from another region to District # 280, for the stated reason that the manager had a good deal of management experience, and District # 280 was lacking in experienced District Managers.  Even so, and in any event, De La Rosa

---

[10]Doc. no. 41 (defendant's evidentiary submission), Tab B (deposition of Colleen Epperson), at 34-35.

[11]Wisler Deposition, at 42.

[12]*Id.* at 43-44.  It appears from the record that a Regional Manager in the Optical Division at Wal-Mart is superior to a District Manager, and a Divisional Manager is superior to a Regional Manager.

[13] *Id.* at 44.

[14]Epperson Deposition, at 36.

denied Epperson's request, and plaintiff was awarded the promotion.[15]

As District Manager, plaintiff supervised nine active Vision Centers within her district, and two other centers that were preparing to open.[16]   Her responsibilities included monitoring the performance of these centers, and supervising the Vision Center Manager in each store.[17]   To further these ends, plaintiff was expected to regularly visit each Vision Center within her district.[18]   As plaintiff's direct supervisor, Epperson was primarily responsible for plaintiff's training and performance as an Optical District Manager.[19]  Epperson also was required to approve any hiring and firing decisions concerning Vision Center Managers within the district.[20]  Epperson was based in Wal-Mart's home office in Bentonville, Arkansas, but she visited plaintiff's district once or twice a month, and she sometimes rode with plaintiff as she traveled to different Vision Centers within her district.[21]

Plaintiff lists several examples of her positive job performance as District

---

[15]*Id.* at 40-41.

[16]Wisler Deposition, at 55-57.

[17]Plaintiff points out that Wal-Mart does not maintain a job description for optical positions above Vision Center Manager, but she does not dispute that this is an accurate description of her job duties.  *See* doc. no. 44 (plaintiff's brief), at 27.

[18]Doc. no. 41 (defendant's evidentiary submission), Tab C (Declaration of Colleen Epperson), at ¶ 5.

[19]Doc. no. 45 (plaintiff's evidentiary submission), Tab F (defendant's responses to plaintiff's first interrogatories), at 3.

[20]Epperson Deposition, at 91.

[21]Wisler Deposition, at 79, 91-92.

Manager.  Along with approximately forty-eight other managers, she received an award certificate in November of 2002, because her district outperformed the previous year's sales profit by more than one percent.[22]  She also states that her district climbed in the performance rankings after she became District Manager.[23]  On January 4, 2003, De La Rosa sent an email to plaintiff and other District Managers congratulating them on a "great sales week."[24]  He sent another email to plaintiff and other District Managers on January 11, 2003, which stated "Best Sales from Divison A for WK 50!  Congratulations!!"  On January15, 2003, plaintiff received an email from John West, a store manager within her district, thanking her, and commending her performance as a District Manager.[25]  On January 21, 2003, plaintiff received an email from optometrist Melonie Clemmons, thanking her for providing additional support during a recent management transition.[26]  Plaintiff also claims that her district had been 100% "doctor-in-stock,"[27] that her district had met several marketing initiatives, that she had started a quarterly meeting with the doctors from other districts, and that her statistics with regard to sales, profit, and expenses all had

---

[22]Epperson Deposition, Exhibits 4 & 5.

[23]*See* doc. no. 45 (plaintiff's evidentiary submission), at Tab N and Tab O.

[24]Epperson Deposition, at Exhibit 6.

[25]Doc. no. 45 (plaintiff's evidentiary submission), at Tab T.

[26]*Id.* at Tab JJ.

[27]Plaintiff does not offer an explanation for this term, or its significance.

improved from the previous year.[28]

Within three months of plaintiff's promotion to District Manager, Epperson claims that she began to receive negative feedback about plaintiff from Vision Center Managers in plaintiff's district.[29]   The parties dispute the number of managers who complained.   Plaintiff is aware of only three complaints — from Brenda Feldman, Gaye Holt, and Jessica Clements.[30]   She is aware of these three complaints because other Vision Center Managers informed her of them.[31]   The Vision Center Managers stated that plaintiff threatened their jobs, had a negative attitude, did not regularly visit their Vision Centers, and was unable to answer many of the questions they posed to her.[32]   In July of 2002, while Epperson was in Atlanta, she held a meeting pursuant to Wal-Mart's "Open Door Policy" with several managers who had complained about plaintiff.[33]   These managers told Epperson that they thought plaintiff had poor leadership and communication skills, that she did not visit their stores regularly, and

---

[28]*See* doc. no. 45 (plaintiff's evidentiary submission), at Tab U (email from plaintiff to Ron Tiarks).

[29]Epperson Declaration, at ¶ 7.

[30]Wisler Deposition, at 58.

[31]*Id.* at 59.

[32]Eperson Declaration, at ¶ 7.

[33]Epperson Deposition, at 85-86.  *See also* Epperson Declaration, at ¶ 9.  Pursuant to Wal-Mart's Open Door policy, any employee is free to address concerns to progressively higher levels of management, as necessary, until the issue is resolved.  *See* Epperson Declaration, at ¶ 8; *see also id.* at Exhibit 1.

that she did not provide them the support they needed.[34]

Epperson issued plaintiff a "Written Coaching" — the second step in Wal-Mart's progressive disciplinary process — on July 18, 2002.[35]  However, Epperson subsequently agreed to reduce the discipline to a "Verbal Coaching" — the first step of discipline — because plaintiff became so upset over the Written Coaching.[36]  As part of the Verbal Coaching, Epperson instructed plaintiff to visit each store in her district at least once each  month, and to stay at each store at least half a day.[37]  Plaintiff claims that, prior to July 18, 2002, she *was* visiting each of her stores at least once a month, and that she *tried* to spend at least half a day in each location.[38]  Epperson also cautioned plaintiff that the managers working under her felt threatened, and that her behavior was causing low morale and high employee turnover.[39]  Plaintiff acknowledged that she had need for improvement, and she believed the issues raised in the coaching could be resolved.[40]  Plaintiff does not recall signing the coaching form, and she states the signature on the form does not look like the way she usually

---

[34]Epperson Deposition, at 86, 89.  *See also* Epperson Declaration, at ¶ 9.

[35]Epperson Declaration, at ¶ 10.

[36]*Id.  See also* Wisler Deposition, at 54.

[37]Wisler Deposition, at 62-65.

[38]*Id.* at 65-66.

[39]*Id.* at 62-65.

[40]*Id.* at 51-52.

signs her name.[41]

On January 2, 2003, Epperson received an email about plaintiff from Brenda Felder, a Vision Center Manager within plaintiff's district.   Felder discussed plaintiff's refusal to address behavioral problems with the Licensed Optician in Felder's Vision Center.[42]   Felder also complained about plaintiff's handling of an employee's complaint against her.  Finally, she stated:

> My staff and I are calling it a "Witch Hunt."  Peggy [the plaintiff, Peggy Wisler] keeps dragging things on and on.  Everyone is totally upset and confused.  Everyone including Dr. Cardwell don't [sic] understand why isn't she focusing on trying to correct the tension instead she's causing it [sic].  We feel that our District Manager should be someone we can go to for help to solve a problem, not help creat [sic] them.  Colleen I am really hoping the Peggy [sic] isn't causing all this against me because of the open door policy I used concerning her.  Each time I've come to you individually or with other managers wasn't to get her in trouble or fired. I just felt like her decisions were cloudy because she wasn't looking at the complete picture.  I felt she was looking at things on a personal level.[43]

The following day, January 3, 2003, Gaye Holt, another Vision Center Manager in plaintiff's district, also sent Epperson an email concerning plaintiff.[44] The subject line of the email read, "HELP!!!!," and the message purportedly was sent on behalf of other Vision Center Managers in plaintiff's district.  The email stated,

---

[41]*Id.* at 53.

[42]Epperson Declaration, at ¶ 12; *see also id.* at Exhibit 3.

[43]Epperson Declaration, at Exhibit 3.

[44]*Id.* at Exhibit 4.

in part:

> We, the vision center managers, district 280 have reached a point of total frustration, low morale, hostility even with our district manager. We hoped that we could possibly do a conference call with you ASAP. I have included a list of the stores and managers that want to participate in the conference call.  If you remember, we spoke with you once in an Open Door Situation a few months after Peggy took this district.  She has not changed, in fact is worse.  The morale in our district is at an all time low.  We never see her.  She has been in my store maybe 3 times in one year.  She threatens us with the security of our job.  She belittles us . . . .  Colleen, I ahve [sic] never been, and I have the permission to speak for the following managers, I have never been so discouraged in my life.  I feel belittled, I feel bullied.  We have reached a point where we do not want to even talk to her anymore.  Since she has took over [sic] as district manager we have had 7 vision center managers leave, either to go to another district or to just quit Wal-mart all together [sic]. . . . We have so much to say, Colleen and really need your help with this matter.  Managers are talking about leaving . . . .  Our self-esteem has dropped, our attitudes have changed.  We need help.  There are so many people who want to talk to you about her . . . .[45]

At the end of her email, Holt listed five store managers on whose behalf the email was being submitted: *i.e.,* "Brenda, store 658"; "Josephine, store 809"; "Terri, store 1215"; Cynthia, store 2988"; and "Jessica, store 1578."[46]  She then stated, "[t]he Suwanee store and Villa Ricca stores do not have managers and Kennessaw, Alpharetta and Acworth have new managers that did not know her well enough to speak.  This concludes the entire district."[47]

---

[45]*Id.*

[46]*Id.*

[47]*Id.*

In response, Epperson, accompanied by Divisional Manager Lance De La Rosa and Regional Personnel Manager Teri Johannesen, visited the stores in plaintiff's district on January 8, 2003.[48]   Epperson, De La Rosa, and Johannesen noted that plaintiff had not ensured that certain fixtures and signage specifically requested by De La Rosa during a previous visit be installed.[49]   Plaintiff claims that stores in other districts also had problems obtaining signage, but she does not know whether De La Rosa actually visited any of these stores.[50]   Additionally, during this visit from her superiors, plaintiff was unable to provide financial figures for her district.[51]   Plaintiff acknowledges that it is extremely important for a District Manager to be readily aware of the financial figures for her district, particularly when a regional manager is visiting.  She is not aware of any other District Manager who was unable to provide the appropriate financial information during a visit from De La Rosa.[52]

Epperson and Johannesen subsequently met with plaintiff on January 11, 2003, and Epperson issued her a Written Coaching in Johannesen's presence.[53]   During the

---

[48]Wisler Deposition, at 84.

[49]*Id.* at 85; Epperson Declaration, at ¶ 14; doc. no. 41 (defendant's evidentiary submission), Tab D (Declaration of Lance De La Rosa), at ¶ 6.

[50]Wisler Deposition, at 85-88.

[51]*Id.* at 88-89.

[52]*Id.* at 89.

[53]*Id.* at 77-78.  *See also id.* at Exhibit 3 (Coaching for Improvement Form dated January 11, 2003).  Plaintiff claims the Coaching was issued solely by Epperson, but the form clearly bears the signatures of both Epperson and Johannesen.  *See id.*  Nonetheless, considering the facts in the light most favorable to plaintiff, the court will construe the Coaching as being issued by Epperson, and

Coaching meeting, Epperson, in Johannesen's presence, discussed the following performance problems with plaintiff: *i.e.,* Open Door complaints from Vision Center Mangers within plaintiff's district; low frequency and quality of store visits; lack of support of managers with respect to signage and equipment; unresolved personnel issues in two stores; and failure to know the district's financial numbers during De La Rosa's visit.[54]  Plaintiff did not deny any of these allegations, other than the unresolved personnel issues, which she contends had been resolved.[55]  The Written Coaching form noted that the effects of plaintiff's behavior were low morale, employee turnover, lack of execution, and inability of associates to successfully develop.[56]

During the coaching meeting, plaintiff was instructed to meet with all of her managers within seven days to apologize.  She did so, telling the managers she was sorry for "their interpretation of directives I gave them from home office or from [Epperson]."[57]  Plaintiff also was instructed during her Coaching to visit each of her stores twice each month for a full day each.  She admits that she did not comply with this directive, but contends she was too busy performing other job duties.  Epperson

---

witnessed by Johannesen.

[54]Wisler Deposition, at 96-100.

[55]*Id.* at 100-02.

[56]*Id.* at Exhibit 3.

[57]Wisler Deposition, at 104.

-12-

and Johannesen informed plaintiff that they would follow up within thirty days, and that she would be demoted if the issues discussed in the Coaching had not been resolved.[58]

Plaintiff informed Epperson and Johannesen that she felt like the Vision Center Managers were complaining about her because she was "trying to do the right thing or have them go follow Wal-Mart policy, and that they were using that as an excuse because they didn't really like following directions, you know, the policies."[59] Epperson told plaintiff to call her by the end of the week if she just wanted to be demoted, because Epperson didn't think plaintiff could "make it."[60]  At the end of the Coaching meeting, Epperson told plaintiff she "had had it" with her, threw her pen down, and walked out of the room.[61]  Plaintiff believes that Epperson had decided to demote her at that point.[62]  After Epperson left the room, plaintiff complained to Johannessen about Epperson's behavior.  Johannesen encouraged plaintiff to use the Open Door policy to make a complaint.[63]

Plaintiff did so by sending a letter to Johannessen and De La Rosa on January

---

[58]*Id.* at 109-11.

[59]*Id.* at 183-84.

[60]*Id.* at 289.

[61]*Id.* at 184.

[62]*Id.* at 118-19.

[63]*Id.* at 196-97.

15, 2003, complaining about Epperson and the Written Coaching she had received.[64]

Plaintiff related an incident in which she had challenged Epperson during a meeting.[65]

Subsequently, plaintiff states that Epperson "took every opportunity to be rude and downgrading both in private and public," causing plaintiff to feel "miserable" and to begin "managing out of fear" of suffering humiliation or other negative consequences if she challenged Epperson again.[66]  Plaintiff also complained that Epperson spent too much of their travel time talking about herself, when she should have been discussing work; that she spoke negatively about other Wal-Mart management associates; and that she would often make comments, then say she would deny them if they ever were relayed to her superiors.[67]

Plaintiff also complained in her letter about certain allegedly sexually harassing conduct by Epperson.  Specifically, she stated: (1) that Epperson "goes into great detail about her childhood, bad marriages, emotional and sexual abuse"; (2) that conversations with Epperson "always end up about sex"; (3) that in July of 2002, Epperson asked plaintiff to drop her off at a hotel so she could meet a male friend whom Epperson described as "tall and good looking and great in bed"; (4) that

---

[64]*Id.* at 111-12; *see also id.* at Exhibit 9 (January 15, 2003 letter).

[65]Wisler Deposition, Exhibit 9, at 1 (document bearing Bates Stamp No. P0180).

[66]*Id.* at 3 (document bearing Bates Stamp No. P0182).

[67]*Id.* at 4-6 (documents bearing Bates Stamp Nos. P0183-P0185).

Epperson "has gone on and on about how she likes black men and how she thought York Glover [an African-American Wal-Mart employee] would go very far in this company," and that she and Glover "had such a great time on the road together eating oysters and he treated her like a lady"; and (5) that, during an after-dinner gathering, Epperson licked a beer bottle "as if it were something else."[68]   Plaintiff also complained that Epperson's tendency to discuss personal and sexual topics interfered with plaintiff's ability to perform the duties of her job, because she needed Epperson to discuss training and other work-related issues.[69]

Plaintiff also complained in her letter to Johannesen and De La Rosa that Epperson sent District Managers from other districts to assist the other two District Managers in her region – one of whom was male and the other female — prior to a visit from the home office.  However, the individual who was sent to help plaintiff did not show up.[70]  Further, plaintiff complained that Epperson told her not to trust a visiting Regional Manager, because people suspected him of having something to do with the death of his fiancée, and because he only liked younger women.[71] Plaintiff perceived that Epperson did not like it when others complimented one of her

---

[68]*Id.* at 2, 5, 8 (documents bearing Bates Stamp Nos. P0181, P0184, and P0187).  The court assumes the "something else" to which plaintiff refers is male genitalia.

[69]Doc. no. 45 (plaintiff's evidentiary submission), Tab K (Declaration of Peggy Wisler), at ¶ 4.

[70]Wisler Depositon, Exhibit 9, at 10 (document bearing Bates Stamp No. P0189).

[71]*Id.* at 6. (document bearing Bates Stamp No. P0185).

peers, especially a man. Because Epperson's comments about the visiting Regional Manager were influenced by his gender, and because Epperson mentioned his fiancée and his taste in women, plaintiff considered the comments to be sexually harassing.[72]

After receiving plaintiff's January 15, 2003 letter, Lance De La Rosa immediately began investigating her allegations.[73] De La Rosa contacted plaintiff, as well as eight other District Managers who were supervised by Epperson.[74] None of the other District Managers contacted by De La Rosa reported witnessing any sexually inappropriate comments by Epperson.[75] Plaintiff claims that other managers had discussed Epperson's allegedly inappropriate comments *with her* on prior occasions, but were unwilling to file a formal complaint with higher management for fear of losing their jobs.[76] The only evidence she offers to support this assertion, however, is her hearsay testimony to the effect that one District Manager, Tam Harmon, was fearful of losing her job.[77] Plaintiff also testified that fear prevented *her* from coming forward with complaints about Epperson's behavior prior to January 15, 2003.[78] In any event, after plaintiff's January 15, 2003 complaint, Epperson ceased

---

[72]Wisler Deposition, at 244-45.

[73]*Id.* at 293-94; *see also* De La Rosa Declaration, at ¶ 8.

[74]Wisler Deposition, at 305; De La Rosa Declaration, at ¶ 8.

[75]De La Rosa Declaration, at ¶ 8.

[76]*See* doc. no. 44 (plaintiff's brief), at 37.

[77]Wisler Deposition, at 223-24.

[78]*Id.* at 244.

making sexually offensive comments to plaintiff, because Epperson stopped riding with her to stores throughout the district.[79]

On January 27, 2003, Epperson sent plaintiff an email outlining several problems in the Wal-Mart store located in Villa Rica, Georgia, where plaintiff recently had spent three days dealing with a union arbitration.[80] Epperson encouraged plaintiff to be "more aware of opportunities and have a high sense of urgency to get them taken care of, while you are in the store."[81] Plaintiff acknowledges that the issues identified by Epperson were correct, but she claims that she had asked another manager to take care of the issues, and that some of the issues could be found in any Vision Center.[82]

Plaintiff filed a second Open Door complaint by writing a letter to De La Rosa on February 9, 2003.[83] She stated that, during a meeting in Kansas City,[84] there were several incidents in which she interpreted Epperson's behavior as "an act of retaliation or humiliation towards me."[85] Specifically, she complained that, during group sessions, Epperson would not answer her questions until she asked them

---

[79]*Id.* at 242.

[80]*Id.* at 162-64; Epperson Declaration, at Exhibit 5.

[81]Epperson Declaration, at Exhibit 5.

[82]Wisler Deposition, at 165-70.

[83]*Id.* at 292; *see also id.* at Exhibit 10.

[84]Plaintiff did not specify the date of this meeting.

[85]Wisler Deposition, Exhibit 10, at 1 (document bearing Bates Stamp No. P0195).

twice.[86]  On two occasions during the meeting, when plaintiff showed Epperson her sales numbers, Epperson remarked sarcastically that plaintiff was looking at the wrong numbers, but refused to show plaintiff the allegedly correct numbers.[87]  On one occasion, while plaintiff was on the telephone with one of her Vision Center managers, and asked whether the manager's store had hit the million-dollar sales mark, Epperson stated loudly that plaintiff should already have known the answer to that question.[88]  Further, Epperson "seemed uninterested" when plaintiff informed her that one of the Vision Centers had reached the million-dollar sales mark.[89]  During a weekly conference call with Epperson and the other District Managers in her region, plaintiff used a speaker phone, but Epperson twice asked plaintiff if she was using her cellular phone.[90]  Plaintiff also was annoyed by Epperson's request that she listen to a voice mail from another District Manager, stating how much that District Manager liked Epperson.[91]  Plaintiff also complained that three of the Vision Center Managers in her district had "made it clear to my district that [Epperson] encouraged them to

---

[86]*Id.*

[87]*Id.* at 2 (document bearing Bates Stamp No. P0196); *see also* Wisler Deposition, at 295.

[88]*Id.,* Exhibit 10, at 2 (document bearing Bates Stamp No. P0196); *see also* Wisler Deposition, at 295-96.

[89]*Id.,* Exhibit 10, at 2 (document bearing Bates Stamp No. P0196); *see also* Wisler Deposition, at 297.

[90]*Id.,* Exhibit 10, at 3 (document bearing Bates Stamp No. P0197); *see also* Wisler Deposition, at 297-98.

[91]*Id.,* Exhibit 10, at 5 (document bearing Bates Stamp No. P0199); *see also* Wisler Deposition, at 302.

complain to her and she usually overturned the directions I had given them."[92] Additionally, plaintiff complained that Epperson refused to comment on any of the progress reports plaintiff submitted after her written coaching.[93]

Finally, plaintiff complained about Epperson's failure to assist her with her annual evaluations of Vision Center Managers.   In plaintiff's experience, the Regional Manager attends the evaluation session of every Vision Center Manager. Plaintiff attempted to schedule her evaluation sessions so that Epperson could attend, but Epperson became unavailable at the last minute.  Plaintiff contacted De La Rosa and Johannesen to attend in Epperson's place, but both individuals were unavailable.[94]

Pursuant to Wal-Mart's policy for investigating complaints, De La Rosa was required to interview Epperson, the subject of plaintiff's complaint.[95]  Plaintiff claims that De La Rosa did discuss plaintiff's first complaint with Epperson, and he subsequently informed plaintiff he was concerned about Epperson retaliating against her.[96]   Epperson testified she was aware that plaintiff had filed an Open Door

---

[92]*Id.,* Exhibit 10, at 3 (document bearing Bates Stamp No. P0197).

[93]*Id.,* Exhibit 10, at 4 (document bearing Bates Stamp No. P0198).

[94]Doc. no. 45 (plaintiff's evidentiary submission), Tab K (Declaration of Peggy Wisler), at ¶ 17.

[95]*See id.*, Tab I, at documents bearing Bates Stamp Nos. P0022 and P0025).

[96]*See id.,* Tab U, at 1 (document bearing Bates Stamp No. 3811); *see also* Wisler Deposition, at 314.

complaint against her, but she was not sure of the contents of the complaint.[97]

Epperson received another email from Gaye Holt on February 17, 2003,[98] in which Holt complained that plaintiff instructed her not to have a staff breakfast meeting during non-business hours, and to not allow associates to attend a Christmas party given by a non-associate optometrist, because both could be construed as union meetings.[99] Plaintiff asserts she gave Holt this advice because she had been instructed to do so by her own superiors.  Holt stated, "I just get so frustrated with [plaintiff]. She is constantly giving us wrong information.  She creates extra work because of that wrong info."[100]  Holt also complained that plaintiff had never visited her store.[101]

Plaintiff requested a review after thirty days had expired from her January 11, 2003 Written Coaching.[102]  On February 27, 2003, plaintiff conducted a telephone conference with Epperson and Johannesen.  Epperson commended plaintiff for following her recommendations in the Written Coaching and stated that "things had gotten better."[103]  She noted, however, that there still was room for improvement in plaintiff's performance, and she extended plaintiff's probationary period for an

---

[97]Epperson Deposition, at 123.

[98]Epperson Declaration, ¶ 18; *id.* at Exhibit 6.

[99]*Id.* at Exhibit 6.

[100]*Id.*

[101]*Id.*

[102]Wisler Deposition, at 158.

[103]*Id.* at 160, 311.

additional thirty days to continue monitoring plaintiff's performance.[104]

On that same date, Epperson received an email from Jessica Clements, a Vision Center Manager located within plaintiff's district.[105]   Clements expressed disappointment about the manner in which plaintiff had handled her recent annual evaluation.  She also expressed concern about plaintiff's tendency not to timely respond to questions, stating, "My main concern is that there is a certain sense of urgency that is not given to managers and associates when we have issues, questions, etc. . . ."[106] Clements also stated, "[plaintiff] tends not to take responsibility for things and will blame others constantly for it."[107]  Specifically, Clements stated that plaintiff often blamed Epperson for problems in her stores.[108]  The following day, February 28, 2003, Epperson received an email from Cynthia Etchison, another Vision Center Manager within plaintiff's district.[109]  Etchison complained about her recent annual evaluation from plaintiff, and particularly about receiving a "0" rating in one category.[110]

On February 14, 2003, Clements and Vision Center Manager Terry Kendrick

---

[104]*Id.* at 160.

[105]Epperson Declaration, at ¶ 23, and Exhibit 8.

[106]*Id.,* Exhibit 8.

[107]*Id.*

[108]*Id.*

[109]Epperson Declaration, at ¶ 24, and Exhibit 9.

[110]*Id.,* at Exhibit 8.

forwarded Epperson an email from plaintiff, suggesting that they take a markdown on a recalled item they could not locate within their stores.[111]  Before giving this directive, plaintiff had attempted to obtain Epperson's guidance on the matter, but Epperson did not return plaintiff's phone calls within two days.  Plaintiff wanted to give her managers a prompt response, so she consulted Kathie Dodd, a UPC clerk in Wal-Mart's retail division whom plaintiff considered to be an expert in inventories.[112]  Following her consultation with Dodd, plaintiff sent an email to the managers in her district, instructing them, "when you have finished a recall and you go back and check your on hands from the recall sheet. [sic] If you are absolutley [sic] positive that that frame is not in your store. [sic]  You must take a markdown at that time in order not to shrink."[113]  Plaintiff insists that she intended these instructions to apply *only* to an item that might have been used for a repair or otherwise in the Vision Center.[114]  Nonetheless, she acknowledges that her Vision Center Managers interpreted her email as directing them to do something that would be unethical.[115]

Clements and Kendrick both expressed concern that following plaintiff's instructions would lead to an integrity violation.  Epperson responded to the emails

---

[111]*Id.* at ¶ 19, and Exhibit 7.

[112]Wisler Deposition, at 392-94.

[113]Epperson Declaration, at Exhibit 7.  "Shrink" is the term Wal-Mart uses to describe lost inventory.  Wisler Deposition, at 130, 147.

[114]Wisler Deposition, at 133.

[115]*Id.* at 134.

from Clements and Kendrick the same day they were sent, instructing them not to take the markdowns because doing so would be unethical.[116]  Epperson also spoke with plaintiff that same day, instructing her to not take the markdowns, and to clear up the issue with her Managers.[117]

In February or March of 2003, plaintiff and other District Managers were sent to Wal-Mart's headquarters to attend a class on preventing "shrink," or lost inventory.[118]  Plaintiff acknowledges her district had a high "shrink rate," or a high rate of lost inventory, but states that problem was present when she arrived on the job.[119]  Wal-Mart gave an examination to the employees attending the class in order to measure progress, and plaintiff failed the exam.[120]  Other district managers — including Tam Harmon, Brian Kelso, Gerrie Livingston, and Bill Trimble — also failed the "shrink school" test on their first attempt.[121]  These four managers were allowed to take the test a second time, however.  On March 3, 2003, after failing the test, plaintiff submitted to Epperson the following statement as her "plan of action" for improvement in the area of "shrink":

---

[116]Epperson Declaration, at Exhibit 7.

[117]Wisler Deposition, at 392-94; Epperson Declaration, at ¶ 20.

[118]Wisler Deposition, at 148.

[119]*Id.* at 146-47.

[120]*Id.* at 150, 194.

[121]Doc. no. 45 (plaintiff's evidentiary submission), at Tab X.

My plan of action after attending Shrink school is that after I have attended the meeting I have a much better understanding of the reports that are available to the District Manager's [sic] and also I now have a much better understanding of how to use the reports to recognize red flags and stop any errors causing shrink and go back and correct them. I really liked the guideline of reports and which one to use to solve any red flags found.   This will be a tremendous tool to develop my managers.[122]

Epperson and De La Rosa found plaintiff's plan of action to be inadequate.[123]

Plaintiff sent De La Rosa a third Open Door complaint, via email, on March 4, 2003.[124]   Plaintiff expressed concern over the stability of her position, and the ongoing potential for retaliation by Epperson.  She claimed that District Manager Tam Harmon suggested it would be in her best interest to transfer to another district, because Harmon had heard Epperson complain about plaintiff.  She also claimed that another District Manager suggested she come to him with questions, rather than approaching Epperson, because Epperson would "make a big deal about a question and say you don't know what you are doing."[125]  Further, plaintiff complained to De La Rosa that Epperson had extended her thirty-day probationary period, citing plaintiff's "two big mistakes last month" (*i.e.,* failing the shrink school exam and

---

[122]Wisler Deposition, at Exhibit 8.

[123]Epperson Declaration, at ¶ 25; De La Rosa Declaration, at ¶ 13.

[124]Wisler Deposition, at 304, and Exhibit 11.

[125]*Id.*

giving her managers instructions about markdowns) as the reason.[126]

On March 4, 2003, De La Rosa and Epperson met with plaintiff and informed her that she was being demoted from the position of Optical District Manager, back to Manager of a Vision Center.[127]   During the meeting, Epperson filled out a "Coaching for Improvement" form, reflecting that plaintiff was receiving a "Decision Making Day" — the final step prior to termination in Wal-Mart's progressive disciplinary process — and was being demoted.[128]  The form, which was signed by both Epperson and De La Rosa, gave the following reasons for the demotion decision: "Continuation of poor decisions – *i.e.,* Markdowns on Recall balances – Direction given, completely against co. policy," and "High Shrink School failed 60% entry, 68% post-test – Plan of action w/o substance."[129]  The form also stated that the impact of plaintiff's behavior on Wal-Mart was "jeopardizing the integrity of [managers] that report to her," and "company assets lost w/continued shrink."[130]  Plaintiff does not know who made the decision to demote her, but she believes the decision was based on Epperson's recommendation.[131]

---

[126]*Id.*

[127]Epperson Declaration, at ¶ 27; De La Rosa Declaration, at ¶ 15.

[128]Epperson Declaration, at ¶ 27.

[129]Wisler Deposition, at Exhibit 6.

[130]*Id.*

[131]Wisler Deposition, at 313.

After plaintiff's demotion, Wal-Mart offered her a position as Manager of a Vision Center in Pulaski, Tennessee.[132]  She was told that Wal-Mart believed she could succeed again as a Vision Center Manager, and that she might be able to work her way back up to be an Optical District Manager.[133]  She told Teri Johannesen that Pulaski was too far from her home, and Johannesen subsequently offered her a Manager position at a Vision Center in Huntsville, Alabama.[134]  Plaintiff never started working in that store, however, because she requested and received a medical leave of absence, based in part on depression and Chron's Disease, on March 10, 2003. The leave subsequently was extended for an additional ninety days.[135]  Plaintiff never returned from her medical leave, and she voluntarily resigned her employment with Wal-Mart on August 26, 2003.[136]

Following her March 4, 2003 demotion, plaintiff again utilized Wal-Mart's Open Door Policy on March 10, 2003, by sending a letter to Ron Tiarks, the Senior Vice President of Wal-Mart's Optical Division.[137]  In that letter, plaintiff listed all her accomplishments as District Manager, named several individuals who could speak

---

[132]*Id.* at 334.

[133]*Id.* at 47-48.

[134]*Id.* at 335-336.

[135]*Id.* at 343-44.

[136]*Id.* at 47-48.

[137]*Id.* at 312-13, and Exhibit 12.

favorably on her behalf, and made statements refuting each of the reasons offered on the "Decision Making Day" coaching form for her demotion.[138]  She also stated that she believed her demotion

> was complete retaliation from Colleen Epperson because I used the "Open Door Policy" through Lance De La Rosa a few days after my first coaching (based on unhappy managers complaints [sic] to Colleen because I was micro managing many parts of the business and enforcing all rules) from Colleen on January 11th, 2003.[139]

Plaintiff also stated that De La Rosa had voiced concerns to her about Epperson retaliating against her after the first Open Door complaint.  Finally, plaintiff stated she felt like she and Epperson "have a personality conflict."[140]

Plaintiff's complaint was investigated by Bob Randall, the Personnel Director over Wal-Mart's Optical Division.[141]  Randall spoke to plaintiff, De La Rosa, Epperson, and Johannesen, and reviewed plaintiff's prior Open Door Complaints, as well as documentation related to her job performance.[142]  Randall also spoke to three individuals — an optometrist, a Store Manager, and a District Manager — whose names plaintiff provided as references.  Each of these individuals reported positive

---

[138]Wisler Deposition, at Exhibit 12.

[139]*Id.* at document bearing Bates Stamp No. P0205.

[140]*Id.*

[141]Wisler Deposition, at 325-26.

[142]Doc. no. 41 (defendant's evidentiary submission), Tab E (Declaration of Robert Randall), at ¶¶ 4-8.

experiences with plaintiff,[143] but they did not offer any information which convinced

---

[143]For example, notes from the investigation of plaintiff's complaint indicate that, on March 25, 2003, Matt Corley, a Store Manager, stated that plaintiff

> took care of any and all issues without hesitation in his store and to his knowledge the other stores in the district.

> Matt stated that in his opinion there were instances that he felt perhaps [plaintiff] was operating in a hostile work environment based upon her reactions to the manner in which she received business direction. He said sometimes she seemed upset and conflicted about how to properly operate do to this situation [sic].

> Matt stated that [plaintiff] was effective as a specialty DM in his store with the exception of some staffing choices that she made. He said he had discussed his concerns about this matter with her and they had made plans to partner in future management placement.

> Matt stated that [plaintiff] was more than willing to take ownership in everything that occurred within the Vision Center. He said that she would come to him when she felt she had gone down the wrong path and enlist his support to correct the situation.

Epperson Deposition, Exhibit 9. These same notes reflect comments by Dr. Melanie Clemons, an optometrist.

> Dr. Clemons stated that [plaintiff] addressed all issues in her store quickly. Dr. Clemons felt that [plaintiff] offered mores support [sic] than the previous DM and that she was frequently at the store and often sent in Other [sic] managers and associates to help out.

> Dr. Clemons stated that she couldn't really comment as to whether [plaintiff] was functioning in a hostile work environment, but that she did observe [plaintiff] being frustrated when trying to get an answer or support from Home Office.

> Dr. Clemons felt that [plaintiff] was very effective in her store and with other O.D.s throughout the district. She stated that even if they did not always agree, [plaintiff] was willing to work through the issues and compromise for the good of the total business.

> Dr. Clemons stated that in her opinion Peggy took ownership of everything that occurred in her store and within the district.

-28-

Randall that plaintiff had been retaliated against.[144]  Plaintiff claims that Randall told her he found evidence that plaintiff had been undermined by Epperson for speaking her mind, and that Epperson had leadership issues and made mistakes.[145]  Randall, however, states that he never told plaintiff he had any evidence that she had been retaliated against, or that she had been undermined by Epperson.[146]  At the conclusion of his investigation, Randall determined that the performance issues identified by Epperson, De La Rosa, and Johannesen supported plaintiff's demotion.[147]  Ron Tiarks subsequently informed plaintiff the demotion decision was being upheld.[148]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 3, 2003,[149] alleging several instances of sexual harassment by Epperson that she had not previously mentioned in any of her Open Door complaints to Wal-Mart.  Specifically, plaintiff stated that Epperson often made sexual comments to her in front of De La Rosa and Johannesen, and that neither De La Rosa nor Johannesen did anything to stop Epperson's behavior.[150]  Plaintiff

---

*Id.*

[144]Randall Declaration, at ¶¶ 10-11.

[145]Wisler Deposition, at 326-27.

[146]Randall Declaration, at ¶ 13.

[147]*Id.* at ¶ 9.

[148]Wisler Deposition, at 329.

[149]*Id.* at Exhibit 14.

[150]*Id.,* Exhibit 14, at 1-2.

also claimed that, during a corporate event at a Six Flags theme park in May of 2002, Epperson made the following comment about District Manager Tam Harmon: "Look at Tam.  She is beautiful.  I used to look just like her when I was younger.  I could get any man I wanted by running around in just my panties and a bra in front of them and drive them crazy with my long legs and boobs."[151]  She also complained that, during the same trip, Epperson saw a pair of Superman boxer shorts and wanted to purchase a pair for one of her lovers, because "[S]uperman was their theme together and he would 'get so aroused wearing them.'"[152]

Plaintiff also again related the July 2002 incident during which Epperson allegedly asked plaintiff to drive her to a motel room so she could meet her "'man friend.'"  During the drive, plaintiff claims that Epperson "started to go into great detail about how good-looking [her friend] was, about how many times they had been in bed together over the years, and how he could do wonderful things to her.  She told [plaintiff] they got together whenever they wanted to have a good time."[153]

Plaintiff complained that, during an October 2002 recruiting meeting with licensed opticians, Epperson

> launched into detailed stories about how she had two failed marriages, that her ex-husband went into male menopause and left her, but that she

---

[151]*Id.* at 2.

[152]*Id.*

[153]*Id.*

still loved him and he would be the only man she would ever truly love, that her second husband was just good and young, and that she had worked her way up in Wal-Mart so that she could maintain a financially independent lifestyle.  She insinuated that she liked her lifestyle because she was not tied down to any one man and could live a promiscuous lifestyle of being with any man she wanted when she wanted.[154]

According to plaintiff, District Manager Bill Trimble also was present during this conversation.[155]  Plaintiff further stated that,

> in December 2002, all of the district managers met for a two-day meeting.  Ms. Epperson drank too much at dinner, and pretended her beer bottle was a penis and licked it.  Later, we were all visiting in a sitting room, and Ms. Epperson joined us and took over the conversation, telling us about how she had offers of marriage, but liked her lifestyle, and didn't want to marry a particular gentleman because he was old and she didn't know how much longer he would be good in bed. She continued by telling us about her friend's son who hired a "queer" to cut off his private parts in a motel room and ended up in the hospital hemorrhaging, but now is taking hormones and growing breasts.[156]

Plaintiff testified in her deposition that District Managers Bill Locassio, Tam Harmon, Gus Riley, and Gerri Livingston also were present during this gathering, and that Epperson's comments were directed to the group, not to plaintiff specifically.[157]

Finally, plaintiff complained in her EEOC Charge that, on January 8, 2003,

> Ms. Epperson brought Mr. Del a Rosa [sic] and Ms. Johanneson [sic] to look at our stores.  Ms. Epperson told stories about how good she looked

---

[154]*Id.*

[155]Wisler Deposition, at 322.

[156]Wisler Deposition, Exhibit 14, at 2.

[157]Wisler Deposition, at 260.

when she was younger, and how she could get great tips waiting tables in short shorts and flashing some cleavage. She even joked about her Wal-Mart Sensitivity classes not working. Surprisingly, Mr. De la Rosa [sic] and Ms. Johanneson [sic] did nothing to control or stop her inappropriate, lewd conversation.[158]

In her deposition, plaintiff also testified that Epperson sexually harassed her by telling her that Epperson's children were affected by her husband's instability.[159]

Plaintiff does not claim that Epperson ever made sexual advances to her, or to any other Wal-Mart employee.[160]

Plaintiff acknowledges that she made comments containing sexual content to Epperson. Specifically, plaintiff told Epperson that her father, who was in the "Alzheimer's unit," wanted to remain sexually active, and had even barricaded himself in his room with a woman. Because plaintiff was her father's guardian, she had to give him permission to engage in sexual conduct.[161] Plaintiff also acknowledges she told Epperson, De La Rosa, and Johannesen that her son had showed her his first pubic hair.[162]

Wal-Mart maintains a "Harassment/Inappropriate Conduct" policy that

---

[158]Wisler Deposition, Exhibit 14, at 2.

[159]Wisler Deposition, at 238-40.

[160]*Id.* at 366.

[161]*Id.* at 366-68.

[162]*Id.* at 368-69.

prohibits sexual harassment.[163]   The policy provides:

> Harassment or Inappropriate Conduct of any type, whether sexual, ethnic, or racial, is not tolerated at Wal-Mart.  Wal-Mart is committed to maintaining a work environment that is free of unlawful harassment as well as other inappropriate conduct, regardless of whether the conduct rises to the level of unlawful harassment.  We want to provide a work environment where everyone is comfortable.
>
> **Any negative or stereotypical comment or action, whether welcome or unwelcome, aimed at an individual's gender, race, religion, physical or mental disability, physical appearance, age, marital status, national origin, color, or sexual orientation is inappropriate at Wal-Mart and will not be tolerated.**
>
> Associates who engage in any type of harassment or inappropriate conduct on Wal-Mart property, at Wal-Mart sponsored functions, or while traveling on behalf of the Company, whether "on the clock" or not will be subject to disciplinary action up to and including termination.
>
> Associates who are subjected to conduct prohibited under this policy are encouraged to report their concern to any salaried member of management.  Prompt action will be taken and no retaliation will occur against the Associate making the report.   All allegations of harassment/inappropriate conduct will be investigated.  Confidentiality will be maintained to the extent that is practical.  Appropriate action will be taken to eliminate such conduct and to ensure there will be no recurrence of the conduct.  If you, or someone you work with, have been a victim of harassment or inappropriate conduct, you should immediately report the offensive conduct to a salaried member of management.  You may also contact your Regional Personnel manager, the People Group, or the Ethics Hotline (1-800-WMETHIC).[164]

Another Wal-Mart policy statement provides the following as examples of sexually

---

[163]*See* Epperson Declaration, at Exhibit 11.

[164]*Id.* (emphasis in original).

harassing behavior: "Explicit sexual propositions"; "Sexual innuendoes"; "Suggestive comments or questions about sexual activities"; "Sexually oriented 'kidding,' 'teasing' or, 'practical jokes'"; "Jokes about gender-specific traits"; "Foul or obscene language or gestures"; "Display of foul, obscene or sexually suggestive printed or visual material"; "Physical contact such as patting, pinching, or brushing against another's body suggestively or offensively"; and "Disparaging comments that are gender-specific."[165] The policy also states that "Gossiping or spreading rumors or lies about other Associates can also create a hostile environment by interfering with an individual's job performance."[166]

Additionally, it is Wal-Mart's policy to investigate all complaints of harassment in accordance with the following procedures:

- All supervisors have an obligation to report cases or suspected cases of harassment.

- Complaints reported to Hourly Supervisors must be reported to a salaried member of management.

- All complaints of sexual harassment must be reported to the Facility Manager and the District Manager/Director of Operations.

- Complaints should be investigated by the Facility Manager, District Manager/Director of Operations or Regional Personnel

---

[165]Doc. no. 45 (plaintiff's evidentiary submission), Tab I, at document bearing Bates Stamp No. P0021.

[166]*Id.* at document bearing Bates Stamp No. P0022.

Manager.  All Division 07 complaints will be investigated by the facility's Personnel Manager.  If the complaint involves one of those Managers, a higher level of salaried Management should conduct the inquiry.  If the facility Manager is out of the facility for an extended period of time (i.e., vacation, leave of absence) or if the facility Manager is unable to conduct the investigation, an Assistant Manager must contact the Regional Personnel Manager or District Manager/Director of Operations to ensure the investigation begins immediately.  Home Office investigations will be conducted by the Divisional People Director or the Corporate Associate Relations Department.

- The investigation should be designed to:
  - determine whether the allegations are true;
  - determine whether the allegations, if true, constitute harassment/inappropriate conduct;
  - determine whether remedial action is needed to deter the conduct; and
  - to maintain confidentiality.

- Interview all necessary parties, including the person alleged to have engaged in the conduct, to determine what occurred, when, where, and who was involved and obtain a written statement from all parties interviewed.  Conduct all interviews privately, and involve only as many people as are needed to accurately obtain factual information.

- Evaluate all relevant information.  Consider interviews, written statements, documents or other materials carefully to determine whether harassment/inappropriate conduct occurred as alleged.

- Copies of all written statements should be forwarded to the Regional Personnel Manager or People Director.  The original statements should be maintained at the facility in a locked filing cabinet.  They are not to be placed in a personnel file.[167]

---

[167]Doc. no. 45 (plaintiff's evidentiary submission), Tab I, at documents bearing Bates Stamp Nos. P0022-P0023.

Finally, it also is a violation of Wal-Mart's policies for an employee to retaliate against another employee for "either reporting an incident of harassment/inappropriate conduct or cooperating with an investigation."[168]   All management employees at Wal-Mart receive training on sexual harassment and retaliation.[169]

## PART THREE

### Abandonment of State Law Claims

At the summary judgment stage, plaintiff effectively abandoned her state law claims for negligent and/or malicious retention, supervision, and training.  Plaintiff has offered *no* response to defendant's well-supported arguments that summary judgment should be granted on those claims.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground

---

[168]*Id.* at document bearing Bates Stamp No. P0023.

[169]Wisler Deposition, at 353-54.

for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269

(7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for

summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his
> pleadings to avoid judgment against him.  There is no burden on the
> district court to distill every potential argument that could be made
> based upon the materials before it on summary judgment.  Rather, the
> onus is upon the parties to formulate arguments; grounds alleged in the
> complaint but not relied upon in summary judgment are deemed
> abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).[170]

## PART FOUR

### *Sexual Harassment*

Plaintiff claims that Epperson's sex-related comments created a sexually hostile

work environment.  To succeed on this claim, plaintiff must show that:  (1) she

belongs to a protected group; (2) she was subjected to unwelcome sexual harassment;

---

[170] *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

(3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer responsible under a theory of either vicarious or direct liability. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

The first two elements of a *prima facie* case are not in dispute. As a female, plaintiff belongs to a protected group. *See Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman."). Further, plaintiff was subjected to comments and behavior she found unwelcome. The remaining elements, however, require more careful consideration.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . *because of* . . . sex.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis supplied); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.") (Edmondson, J., concurring). The "critical issue," according to the Supreme Court, "is whether members of one sex are exposed to disadvantageous

terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  Stated somewhat differently,

> [t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion. . . .  In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that *but for the fact of her sex*, she would not have been the object of harassment. . . .

*Henson*, 682 F.2d at 903-04 (citations omitted) (emphasis supplied).  "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; *the mistreatment must be because the employee was female*."  *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (emphasis supplied).

These same principles apply when the alleged harassment occurs between individuals of the same gender.  "[S]ame-sex sexual harassment is actionable under Title VII."  *Oncale*, 523 U.S. at 82.  "[N]othing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Id.* at 79.

Consequently, hostile-work-environment-sexual-harassment claims will lie for either male-on-male, or female-on-female, harassment.  "[S]ame-sex sexual

harassment can give rise to the same inference of impermissible discriminatory animus as does different-sex sexual harassment, depending on the sexual preferences of the harasser." *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1242 n.10 (11th Cir. 1998).

> When a person "sexually harasses" another, *i.e*., makes comments or advances of an erotic or sexual nature, we infer that "the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers." *Fredette v. BVP Management Assocs*., 112 F.3d 1503, 1505 (11th Cir. 1997), *cert. denied*, __ U.S. __, 118 S. Ct. 1184, 140 L. Ed. 2d 315 (1998).  Unless there is evidence to the contrary, therefore, we also infer that the harasser treats members of the "non-preferred" gender differently — and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender.  *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion.").  The inference can be drawn regardless of the sexual orientation of the harasser, so long as the harassed victim is of the harasser's "preferred" gender.  As the Supreme Court explained in *Oncale v. Sundowner Offshore Services, Inc*. 523 U.S. 75, __, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998),
>
>> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.  The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.

*Llampallas*, 163 F.3d at 1246-47 (quoting *Oncale,* 523 U.S. at 80).  Even so, there is no requirement that a plaintiff prove the harasser was motivated by homosexual

desire.

> But harassing conduct need not be motivated by sexual desire to support
> an inference of discrimination on the basis of sex.  A trier of fact might
> reasonably find such discrimination, for example, if a female victim is
> harassed in such sex-specific and derogatory terms by another woman
> as to make it clear that the harasser is motivated by general hostility to
> the presence of women in the workplace.  A same-sex harassment
> plaintiff may also, of course, offer direct comparative evidence about
> how the alleged harasser treated members of both sexes in a mixed-sex
> workplace.  Whatever evidentiary route the plaintiff chooses to follow,
> he or she must always prove that the conduct at issue was not merely
> tinged with offensive sexual connotations, but actually constituted
> "discrimina[tion] . . . because of . . . sex.'"

*Oncale*, 523 U.S. at 80.

Plaintiff has not offered sufficient evidence to support the argument that

Epperson's alleged harassment of her was based on the fact that plaintiff is a female.

She cannot satisfy any of the three evidentiary frameworks suggested in *Oncale*.[171]

Specifically, she has not shown, or even alleged, that Epperson is a lesbian, or that

Epperson's conduct was motivated by sexual desire for plaintiff.

On the other hand, plaintiff has not shown that Epperson used "such sex-

specific and derogatory terms" that it is clear that Epperson was "motivated by

general hostility to the presence of women in the workplace." *Oncale,* 523 U.S. at 80.

Plaintiff did testify in her deposition that Epperson gave more supervisory support to

---

[171]Plaintiff correctly points out that these three evidentiary frameworks were not intended by
the Supreme Court in *Oncale* to be exclusive.  Even so, plaintiff has not offered proof of sex-based
harassment through these frameworks, or by any other means.

the male district managers in her region.  Nevertheless, plaintiff later acknowledged that Epperson supported the female district managers, and that it was only plaintiff who did not receive Epperson's support.[172]  Plaintiff also points out that Epperson initially had requested a male District Manager for the position eventually awarded to plaintiff.  All that fact demonstrates, however, is that Epperson initially preferred a male candidate for the position; it does not demonstrate that Epperson fostered a general hostility toward women in the workplace.  Indeed, Epperson later approved the selection of plaintiff for the position, and she approved the hiring of other female managers as well.

Finally, plaintiff has not offered any "direct comparative evidence" that Epperson treated her differently from (*i.e.,* less favorably than) males in the workplace.  Contrary to plaintiff's assertions, Epperson did not single her out as the sole recipient of her sexual comments.  Indeed, the following events occurred in front of a mixed group of males and females in a hotel room: (1) Epperson's comment that she was not interested in an older gentleman because she did not know how much longer he would be good in bed; (2) Epperson's comment that a friend's son had his penis removed by a "queer" in a motel room; and (3) Epperson's licking of a beer bottle as if it were a penis.[173]  Further, Epperson's comment about how she worked

---

[172]*See* Wisler Deposition, at 67-70.

[173]*See id.* at 259-60.

as a waitress when she was younger, and could get a lot of tips because of her cleavage and long legs, was made in the presence of both Teri Johannesen, a female, and Lance De La Rosa, a male.[174]   Epperson's comments about her two failed marriages, about her ex-husband going into male menopause and leaving her, and about her second husband being "good and young," also were made in the presence of a mixed-gender group of optometrist recruits.[175]   (Plaintiff testified that her male co-worker Bill Trimble was present during this incident.)[176]

The remaining incidents about which plaintiff complains are: (1) Epperson's request for plaintiff to drive her to a motel to meet her lover; (2) Epperson's comments about York Glover; (3) Epperson's comment that Tam Harmon was beautiful and that, when Epperson used to look like her, she could attract men with her long legs and cleavage; (4) Epperson's statement about purchasing Superman boxer shorts for her lover; and (5) Epperson's comment about her children being affected by her husband's instability.   The comment about Epperson's children has no sexual content or connotation whatsoever, and it clearly was not based on sex, either plaintiff's or anyone else's.

Epperson's remaining comments, likewise, were not based on *plaintiff's* sex.

---

[174]*Id.* at 318-19.

[175]*See id.* at 321-22, and Exhibit 14.

[176]Wisler Deposition, at 322.

With regard to York Glover, Epperson stated that he was a "class act," that she liked black men, and that he would go far in the company. She also stated Glover "treated her like a lady," and that she enjoyed traveling with him. These last comments are only ambiguously sexual in nature, at best. If anything, they were based on *Glover's* sex or race, not on *plaintiff's* sex. The remaining incidents could more reasonably be construed as being sexual in nature, but there is no evidence that they occurred *because plaintiff is a female.* Indeed, Epperson's request for plaintiff to drive her to a motel to meet a lover,[177] and Epperson's comments about Superman boxer shorts, both relate to Epperson's sexual encounters with men; and Epperson's comments about Tam Harmon concerned both men and women. In short, Epperson's comments may have been crude, unprofessional, and highly inappropriate in any context, but there is no indication that Epperson was discriminating against plaintiff on the basis of *plaintiff's* sex. Accordingly, plaintiff cannot establish this element of her hostile-work-environment-sexual-harassment claim.

Additionally, even if Epperson's request for plaintiff to drive her to a motel to meet her lover, and Epperson's comments about York Glover, Tam Harmon, and

---

[177]Plaintiff asserts in her brief that she was "forced to participate" in Epperson's sexual affairs "by driving Epperson to meet her lovers." Plaintiff's brief, at 54. There is *no* evidence to support the assertion that plaintiff was *forced* to drive Epperson to meet her lover. Instead, the record reflects that Epperson asked plaintiff to drive her, and plaintiff agreed to do so. Further, the record reflects only one instance in which plaintiff was requested to drive Epperson to meet a lover. Thus, the assertion that plaintiff drove Epperson to a hotel to meet a lover on more than one occasion lacks evidentiary support.

Superman boxer shorts could be considered to be based on plaintiff's sex, there is no evidence that the resulting harassment was sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's employment with Wal-Mart.

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective and a subjective component.  To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris,* 510 U.S. at 21-22. When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson,* 234 F.3d at 509 (quoting *Mendoza,* 195 F.3d at 1246); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  However, the factors, taken together, must reveal conduct which is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive.  *See, e.g., Faragher*, 524 U.S. at 788 (citations omitted).

Further, the individual statements and acts complained of must each be (or arguably be[178]) of a sexual or gender-related nature *before* they may be taken into account when determining whether, when considered collectively, they were sufficiently severe or pervasive to create an actionable hostile work environment.

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, *see Mendoza*, 195 F.3d at 1242, the statements and conduct must be of a sexual or gender-related nature — "sexual advances, requests for sexual favors, [or] conduct of a sexual nature," *id*. at 1245 — before they are considered in determining whether the severe or pervasive requirement is met.   Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted.  Title VII, as it has been aptly observed, is not a "general civility code."  *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283-84.

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

Therefore, only the four incidents that can even arguably be considered to be based upon plaintiff's sex — *i.e.,* (1) Epperson's request for plaintiff to drive her to a hotel to meet her lover; (2) Epperson's comments about York Glover; (3) Epperson's comments about Tam Harmon; and (4) Epperson's comments about purchasing Superman boxer shorts for her lover — may be considered in deciding whether the alleged harassment was sufficiently severe or pervasive to be actionable.

---

[178]*See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000) ("We will now consider comments and behavior of [the alleged harasser] that are, *or arguably could be*, considered to be of a sexual or gender-related nature.  We doubt some of it is, but for present purposes we will assume it to be.") (emphasis supplied).

A reasonable jury could conclude that these incidents interfered on at least *some* level with plaintiff's job performance.  Plaintiff contends that Epperson spent too much time discussing sex, and not enough time discussing work-related topics; and that, as a result, plaintiff did not learn how to perform the duties of her job effectively.  However, given that only four instances of alleged misbehavior by Epperson are in consideration, the effects on plaintiff's performance likely were not significant.  *See Lawrence v. Wal-Mart Stores, Inc.,* 236 F. Supp. 2d 1314, 1326 (M.D. Fla. 2002) ("To show alteration of job performance, a plaintiff need not show tangible effects such as economic harm.  However, the plaintiff must show some *material* alteration of job performance from a reasonable person's standpoint.") (internal citations omitted) (emphasis supplied).

Further, none of the remaining incidents reasonably could be considered threatening or humiliating.  Although plaintiff may have found Epperson's comments and requests to be offensive, there is no indication that anyone besides plaintiff and Epperson witnessed them.

Additionally, a reasonable jury would not consider Epperson's behavior to be severe.  The Supreme Court stated in *Oncale,*

> As we emphasized in *Meritor* [*Savings Bank, FSB v. Vinson,* 477 U.S. 47 (1986)] and *Harris,* the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.  The prohibition of harassment

on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S., at 21, 114 S. Ct., at 370, citing *Meritor*, 477 U.S., at 67, 106 S. Ct., at 2405-2406. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace — such as male-on-male horseplay or intersexual flirtation — for discriminatory "conditions of employment."

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." *Harris*, *supra*, at 23, 114 S. Ct., at 371. In same-sex (as in all) harassment cases, that inquiry includes careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field — even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale*, 523 U.S. at 81-82. Considering the social contexts in which Epperson's comments were made — usually between two female coworkers traveling together — there is no indication that the comments were anything more than social banter. This is especially true when plaintiff herself made comments containing sex-related

content to Epperson on at least two occasions (*i.e.,* plaintiff's comments about her father's sex life in the "Alzheimer's unit," and about her son showing her his first pubic hair).

Finally, the court must consider the frequency of Epperson's allegedly offensive comments.  Plaintiff served as a District Manager under Epperson's supervision for more than ten months, and she endured four incidents which can arguably be considered sex-based during that time period.  Although "there is no magic number for frequency," the relevant case law indicates that four incidents over a ten-month time frame should not be considered "pervasive."  *Lawrence,* 236 F. Supp. 2d at 1325 (citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)).  *Compare Miller,* 277 F.3d at 1276 (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson,* 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza,* 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were insufficiently frequent), *Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428,

430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient). This is particularly true when plaintiff herself discussed sex-related topics in Epperson's presence during the relevant time period.

Considering the totality of the circumstances, the court finds that the four incidents which could arguably be considered sex-based were neither sufficiently severe nor pervasive to materially alter the terms and conditions of plaintiff's employment. Accordingly, summary judgment will be granted on plaintiff's hostile work environment claim.[179]

## PART FIVE

### *Retaliation*

"Retaliation is a separate violation of Title VII." *Gupta* 212 F.3d at 586. A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation: (1) she engaged in statutorily protected expression;[180] (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected

---

[179]Even though neither party argues this point, it appears that plaintiff also cannot satisfy the final element of a sexual harassment claim, *i.e.,* that there is a basis for holding Wal-Mart liable for Epperson's actions. Wal-Mart had in place a comprehensive, effective anti-harassment policy which was disseminated to all of its employees. Additionally, Wal-Mart management employees receive training in preventing harassment. Plaintiff first complained about Epperson's behavior to Lance De La Rosa on January 15, 2003, and De La Rosa immediately began investigating. Following the investigation, Epperson ceased making comments which plaintiff found sexually offensive.

[180]"Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer  a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).  Again, plaintiff cannot establish a prima facie case.

Defendant does not dispute that plaintiff suffered an adverse employment action – *i.e.,* her demotion.  Further, considering the facts in the light most favorable to plaintiff, a reasonable jury could conclude that she did engage in statutorily protected expression.  Plaintiff does not allege that she was retaliated against for *participating* in an investigation, proceeding, or hearing under Title VII; instead, she alleges she was retaliated against for *opposing* Epperson's allegedly harassing behavior by making complaints to her superiors through the Wal-Mart Open Door Policy.[181]

_____

[181]Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any

Thus, plaintiff must demonstrate a good faith, reasonable basis for believing that Epperson engaged in unlawful sexual harassment, as distinguished from proving that Epperson actually did engage in unlawful harassment.  *See, e.g., Lipphardt v. Durango Steakhouse of Brandon, Inc*., 267 F.3d 1183, 1187 (11th Cir. 2001); *Harper v. Blockbuster Entertainment Corp*., 139 F.3d 1385, 1388 (11th Cir. 1998).  This "good faith, reasonable basis" requirement has two constituent parts — a subjective and an objective component — as the Eleventh Circuit observed in *Little v. United Technologies,* 103 F.3d 956 (11th Cir. 1997):

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and records presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

---

manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  . . .  And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc*., 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).  Complaints to supervisors about sexual harassment are encompassed within an "opposition clause" claim.  *See Pipkins v. City of Temple Terrace,* 267 F.3d 1197, 1201 (11th Cir. 2001).

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Id.* at 960 (emphasis in original) (footnote omitted). Further, "the objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against the existing law." *Clover v. Total Systems Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also, e.g.*, *Lipphardt*, 267 F.3d at 1187 ("The belief must also be measured against substantive law at the time of the offense.") (citing *Clover*).

Thus, even though this court has concluded that Epperson did not engage in conduct that would support a sexual harassment claim under Title VII, plaintiff still can satisfy this element of her *prima facie* case if she can demonstrate, both subjectively and objectively, a good faith *belief* that Epperson's conduct constituted unlawful sexual harassment. Considering the facts in the light most favorable to

-53-

plaintiff, the court will assume that it was reasonable — both subjectively and objectively — for her to believe Epperson's conduct constituted sexual harassment. At the very least, plaintiff believed Epperson's behavior violated Wal-Mart's anti-harassment policy, which lists the following, among other items, as examples of sexually harassing behavior: *i.e.,* sexual innuendoes, suggestive comments and questions about sexual activities, sexually oriented teasing, foul language, and disparaging comments.

Even giving plaintiff the benefit of such an assumption, however, she still cannot make out a *prima facie* case for retaliation because she cannot establish a causal connection between her Open Door complaints and her demotion. To be sure, the demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial. At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). *Accord*

*Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."). *See also*, *e.g.*, *Gupta*, 212 F.3d at 590 ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Commissioners,* 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Gupta*, 212 F.3d at 590).

Here, plaintiff claims that the temporal proximity between her complaint and the allegedly retaliatory acts by Epperson and De La Rosa establish the required causal connection. She asserts that, after she filed her first Open Door complaint on January 15, 2003, "Epperson *immediately* withdrew all support of [her], including returning her phone calls, voice mails, and emails."[182] She also asserts that Epperson ridiculed her in front of colleagues, made sarcastic remarks, and refused to attend the evaluations of Vision Center Managers with plaintiff. Further, plaintiff claims that,

---

[182]Plaintiff's brief, at 61 (emphasis supplied).

after her second Open Door complaint on February 9, 2003, Epperson refused to answer her questions about taking markdowns on lost inventory, and the action plaintiff subsequently took on her own resulted in discipline.  Finally, she points out that, only one day after her third Open Door Complaint on March 4, 2003, she was demoted.

The "general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799-800 (11th Cir. 2000) (citations omitted).  Even so, there are exceptions.  For example, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  *Brungart,* 231 F.3d at 799-80 (citing *Clover*, 176 F.3d at 1355-56).

Additionally, a causal connection will not be established if the alleged adverse employment action occurred *before* the alleged protected expression.  In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit held that a female radio program host could not prevail on a retaliation claim, because the defendant's alleged retaliatory actions — *i.e.,* the

station changed plaintiff's shifts, cut her pay, and ultimately terminated her — all

occurred *before* she filed an EEOC charge and complained to station managers about

her male co-host's sexual harassment.

> Johnson engaged in statutorily protected expressions by filing a charge with the EEOC in June 1997 and complaining about Donnell's harassment to Walker and Balton on June 6, 1997. Johnson's employment with WENN ended on May 28, 1997. Thus, Johnson's June 1997 protected expressions occurred after her employment ended in May 1997, and WENN's employment decisions could not have been based on Johnson's protected expressions. Hence Johnson cannot prevail on her retaliation claim, as she failed to satisfy the third [element of a prima facie case]: a causal relationship between her complaining about Donnell's harassment and her transfers or termination. We therefore affirm the district court's dismissal of Johnson's retaliation claims.

*Id.* at 507.

Further, in *Pipkins v. City of Temple Terrace,* 267 F.3d 1197 (11th Cir. 2001),

the Eleventh Circuit confronted a claim by an employee who asserted she received

a series of negative employment evaluations in retaliation for making complaints

about sexual harassment. The employee first complained in either November or early

December of 1994, but her negative evaluations commenced in October 1994. *Id.* at

1199. The Eleventh Circuit held that, because the plaintiff's performance problems

began *before* she lodged a sexual harassment complaint, she could not establish a

causal connection between her complaint and her negative evaluations.

Even assuming, however, that [the plaintiff] suffered an adverse

employment action, any protected expression on her part occurred only after the commencement of the adverse employment actions of which she complains. According to [the plaintiff's] own allegations, she first notified [her employer] of her concerns in November or December of 1994. Her evaluations, though, began to suffer as early as October 1994.

As for [the plaintiff's] continuing negative evaluations, they were in response to well-documented job performance deficiencies.

*Id.* at 1201 (footnote omitted).

The parties to this action are in dispute as to whether Epperson was aware of the fact that plaintiff had complained of sexual harassment in her January 15, 2003 Open Door Complaint. Construing the facts in the light most favorable to plaintiff, this court concludes that Epperson was aware of the harassment complaints. Further, and in any event, there is no dispute that De La Rosa knew of plaintiff's harassment complaints, and that he was involved in the decision to demote plaintiff.

Despite these facts, however, the salient issue is whether the alleged retaliation began to occur before or after plaintiff's Open Door complaints. In her complaint, plaintiff claimed that Epperson retaliated against her by "withdrawing support, not returning phone calls or e-mails, disparately disciplining her and other adverse terms and conditions of employment."[183] In her brief, she describes the following ways in which Epperson retaliated against her, aside from her demotion:

---

[183]Amended complaint, at 9.

Epperson also completely withdrew her support from Ms. Wisler, including no longer riding in Ms. Wisler's district with her, no longer returning phone calls, voice mails and emails, and no longer answering Ms. Wisler's questions, thereby compromising Ms. Wisler's ability to perform her job.  Epperson was primarily responsible for training and supporting Ms. Wisler, yet she completely ceased to do so following Ms. Wisler's protected activity.  Further, Epperson encouraged vision center managers to complain about Ms. Wisler, yet Epperson did not interview Ms. Wisler about these complaints, and chose to discipline her instead. There are facts in the record that Epperson purposefully ridiculed and embarrassed Ms. Wisler in front of her colleagues after Ms. Wisler made her open door complaint.  Epperson de la Rosa [sic] and Johannesen chose not to attend the annual evaluations of the vision center managers with Ms. Wisler in February 2003.  When two of the vision center managers complained about their evaluations, Epperson and de la Rosa [sic] used this as ammunition to partially justify their demotion of Ms. Wisler.  Ms. Wisler's initial thirty day coaching was extended another thirty days.[184]

Many of these allegations mirror those plaintiff made in her January 15, 2003 Open Door Complaint.  There, plaintiff claimed that Epperson embarrassed her in front of colleagues after plaintiff had challenged Epperson in a meeting.  She stated that Epperson "took every oppourtunity [sic] to be rude and downgrading both in private and public," and that as a result, she had been miserable and "managing out of fear" for the last three months.[185]  She complained that Epperson "spends time in the car talking about herself mostly.  I would have loved for that to be a constructive question answer time but that is very rarely the case."[186]  She further stated that

---

[184]Plaintiff's brief, at 59.

[185]Wisler deposition, Exhibit 9, at 3 (document bearing Bates Stamp No. P0182).

[186]*Id.* at 4 (document bearing Bates Stamp No. P0183).

Epperson had promised to send an experienced District Manager to plaintiff's store to provide support, but the person never came.   Plaintiff stated she wanted to accompany Epperson when she toured the stores in the district, but she missed the chance because Epperson did not return her phone calls.   Plaintiff complained that, during a regional meeting, Epperson yelled at her in front of others and did not include her in a list of District Managers Epperson thought would become Regional Managers.   By this time, plaintiff alleged that Epperson's "return phone calls or responses to my voice mails became few and far between," and that Epperson did not return her calls because she thought plaintiff's questions were "dumb."[187]   Epperson allegedly responded to plaintiff's questions with laughter and sarcastic comments. Plaintiff also accused Epperson of setting her up for failure during a visit by management: "[s]he had been having conversations with my unhappy managers that I was keeping close tabs on because they are so negative.   I'm sure she made things worse and encouraged their petty complaints."[188]   She stated that other managers had the belief that they could call Epperson if they ever questioned one of plaintiff's directives, and Epperson would automatically overturn the directive.   Finally, she complained that, during her Written Coaching meeting, Epperson told her to call her by the end of the week if she just wanted to be demoted, because Epperson thought

---

[187]*Id.* at 9 (document bearing Bates Stamp No. P0188).

[188]*Id.* at 12 (document bearing Bates Stamp No. P0191).

plaintiff would never make it.

Additionally, plaintiff testified in her deposition that Epperson had stopped returning her phone calls by November or December of 2002.[189]  Plaintiff also testified that she believed Epperson had decided to demote her at the time of her January 11, 2003 coaching — four days before her first Open Door letter.

Thus, it is apparent that Epperson's alleged mistreatment of plaintiff — including intimidation, humiliation, failure to return phone calls, failure to provide necessary support, and setting plaintiff up for failure — commenced *prior to* plaintiff's first Open Door complaint.  Indeed, much of this behavior was the subject of the Open Door complaint.  Moreover, plaintiff's job performance was called into question *before* her Open Door complaint.  By January 15, 2003, plaintiff had already received one verbal coaching and one written coaching.  It is true that plaintiff was not demoted — a tangible adverse employment action — until after she had filed *three* Open Door complaints, but it is also clear that Epperson's alleged retaliatory behavior, including the events leading up to plaintiff's demotion, began prior to any of plaintiff's harassment complaints.  Further, and significantly, plaintiff testified to her belief that Epperson decided to demote her at the time of her written coaching, which occurred prior to plaintiff's first Open Door complaint.[190]  Indeed, Epperson

---

[189]Wisler Deposition, at 265-66.

[190]*See* text accompanying note 62, *supra.*

and Johannesen informed plaintiff during her January 11, 2003 coaching that she would be demoted if her performance problems were not resolved.  Thus, because plaintiff's performance problems and Epperson's allegedly retaliatory behavior both began prior to plaintiff's first Open Door complaint, plaintiff cannot establish a causal connection between any protected expression and her subsequent demotion.  *See Pipkins,* 267 F.3d at 1201.  Plaintiff, therefore, cannot establish a *prima facie* case of retaliation.

Even if plaintiff could establish a *prima facie* case of retaliation, however, her claims still would fail.  Wal-Mart has presented a legitimate, non-retaliatory reason for plaintiff's demotion — *i.e.,* her repeated, documented performance problems.  The Coaching for Improvement form plaintiff received at her demotion listed several reasons for the demotion decision, including poor decisionmaking regarding markdowns on recalled items, failing shrink school, jeopardizing the integrity of the managers working under her, and loss of company assets through shrink.  *See Schoenfeld v. Babbitt,* 168 F.3d 1257, 1269 (11th Cir. 1999); *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that continued violation of workplace rules is a legitimate reason for disciplining, or even terminating, an employee).

Therefore, plaintiff could proceed to trial on her retaliation claim only if she came "forward with evidence, including the previously produced evidence

establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973)). Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman*, 229 F.3d at 1024-25. Plaintiff must show both that defendants' proffered reasons were not the true reasons, and that retaliation was the true reason. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507-08 (1993). Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

To support her claim of pretext, plaintiff states, "[o]f the reasons given for her

demotion, failing shrink school and submitting a plan of action lacking substance are inconsistent, suspect reasons for demotion."[191]   She claims that other District Managers failed the shrink school test and were allowed to retake it, without receiving any disciplinary action.  She also emphasizes that Wal-Mart did not provide copies of any of the other written plans of action submitted by District Managers who had failed the shrink school test.  Therefore, she asserts, Wal-Mart cannot compare these plans to her own, which allegedly was insufficient.

Despite these allegations, plaintiff has offered no evidence that any of the District Managers who were allowed to retake the shrink school exam had a similar record of performance problems, were the subject of multiple employee complaints, or were on probation at the time they failed the test.  Thus, these other District Managers were not sufficiently similar to plaintiff for the more lenient treatment they allegedly received after failing shrink school to demonstrate that defendants' actions against plaintiff were a mere pretext for retaliation.  The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).

---

[191]Plaintiff's brief, at 63.

Thus, plaintiff must show that employees who had *not* engaged in protected conduct were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Maniccia,* 171 F.3d at 1369. Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical." *Cf. Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("[A]lthough Silvera and Ritter have in common the fact that they were arrested in the 1970's . . . Silvera has three additional arrests . . . . The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter."); *see also Maniccia*, 171 F.3d at 1368-69 (holding that a female plaintiff in a Title VII sex discrimination case was not similarly situated to male employees who each committed a single policy violation, whereas the female plaintiff had committed at least four policy violations); *Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1206, 1312-13 (11th Cir. 1998) (holding that employees who allegedly committed one act of misconduct were not similarly situated to the plaintiff, who engaged in multiple instances of misconduct in the same day).

Additionally, plaintiff did not argue that any of the other reasons offered by Wal-Mart to support her demotion decision — including giving her store managers instructions which were against company policy, and continued problems with high

-65-

shrink — were a mere pretext for retaliation. *Combs,* 106 F.3d at 1529 ("[A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action.") (emphasis supplied).

Accordingly, because plaintiff cannot establish a prima facie case for retaliation, and she cannot establish that defendant's proffered legitimate, non-retaliatory reasons for her demotion were a mere pretext for retaliation, her retaliation claim must fail as a matter of law.

## PART SIX

*Conclusion*

In accordance with the foregoing, summary judgment will be granted on all of plaintiff's claims. An appropriate order will be entered contemporaneously herewith.

DONE this 18th day of April, 2006.

_____
United States District Judge